# THE GRACE FLANNERY.

## THE BERN.

### No. 17529.

District Court, E. D. New York.

July 12, 1946.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libellant.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald McKernan, of New York City, of counsel), for respondent.

INCH, District Judge.

Libellant is the owner of the barge Grace Flannery. On Sunday afternoon, April 8, 1945, while she was in tow of the tug Bern, libellant claims that the starboard side of the Flannery was carelessly brought into collision with a scow moored in the vicinity of 30th Street, East River, causing damage. Accordingly, libellant has sued the tug Bern, The Reading Company, claimant.

Counsel for claimant in his brief makes the following statement as to certain material facts being uncontradicted and I think it is substantially correct:

"The barge 'Grace Flannery' was the starboard hawser boat in a tow of five barges which the tug 'Bern' towed from the stakeboat to 29th Street, East River. The towing was performed on April 8, 1945. Three boats were in the head tier and two boats were in the second tier. Six side planks and three king posts located forward of amidships were broken on the starboard side of the 'Grace Flannery'. The damage, as of the date of the survey, (Lib. Ex. 2) was of recent origin. (p. 38). The side of the barge was set inboard. (p. 39).

"It was quite a damage. (p. 40). It required a very heavy force to cause such damage". (p. 40).

If the above included a collision caused by the tug Bern, the issue presented to the court would be simple. However, when the testimony of the various witnesses is considered, the decision must rest upon their veracity and the reasonable inferences from facts.

Witnesses for libellant testified under oath, as eye witnesses, to when, where and how the Flannery received her damage. Witnesses for the tug testified that there was no such collision; that the damage found must have been sustained elsewhere. Counsel for claimant asserts that perjury must have been committed by these witnesses for libellant in order to protect themselves, or particularly the master of the Flannery, from carelessness on his part in some, so far, undiscovered manner.

Furthermore counsel for claimant asserts that in view of the construction of the Flannery it makes the collision, in the manner testified to by libellant's witnesses, incredible. That the "physical factors" in this case indicate that it would be impossible for the Flannery to have received such extensive damage from a collision between the starboard side of the Flannery and the scow, due to the rake of the Flannery. That there was nothing for the Flannery to strike except a space of 28 inches where the rake of the Flannery commenced.

There was also some controversy as to the make up of the tow of the Bern, but as to this I believe the witnesses for libellant and this being so, according to even the testimony of the captain of the tug, it made the tow a little more difficult to handle than otherwise.

The determinative issue therefore is this question of veracity. Eye witnesses for libellant positively state the fact of the colli-

sion, one of them, in a sense, being disinterested. Witnesses for the tug as positively testified that there was no collision. In support of their testimony, counsel for claimant asserts that for the collision to have taken place as testified to by libellant's witnesses would be incredible and contrary to the physical factors.

The Flannery was the starboard hawser boat of the tow. She was loaded with about 500 tons of coal. The scow, Cape South, was the port hawser boat, and the Lake Oneida was the middle boat in the front tier. Both the Cape South and the Lake Oneida were larger boats than the Flannery. The Cape South had about 1,-400 tons of coal on board, while the Lake Oneida, which was next to the Flannery, was loaded with about 1,500 tons of coal. These two boats, the Cape South and the Lake Oneida so loaded were in the front tier of the tug and alongside the Flannery. It would seem reasonable that if a thrust was directed by them through the smaller and lighter boat Flannery on the starboard side in case of a contact by this side with some obstruction, such as this moored unnamed scow, loaded with scrap iron, a considerable blow could arise which otherwise might not have existed.

The remainder of the tow was the barge Butts astern of the Cape South, the port hawser boat, and the Captain Bishop astern of the Flannery, the starboard hawser boat. There was no boat in between. The tug, with hawsers to the head tier of about 100 feet, had proceeded up the East River in a flood tide. It expected to land the Flannery at 30th Street. When it had reached a certain position in the river, the tug rounded to and as this maneuver was being completed, according to the witnesses for libellant, the side of the starboard hawser boat, Flannery, collided with the corner of a deck scow, loaded with scrap iron, lying off a scow or scows, at the wall of that place.

The first and most important fact that must be found is, was there any contact by the Flannery with the moored scow? Libellant placed on the stand two witnesses who swore that there was a hard collision between the two boats.

Van Schaik, master of the Flannery, has had twenty-five years experience, seven of which were on the Flannery. He testified: "It was broad daylight, about four o'clock in the afternoon. The tug rounded to 'kind of swift and my boat hit against the deck scow'. The scow was tied up to 30th Street outside of other boats, quite a bit out in the river. My boat hit kind of cornerwise. We were on deck ready to make a landing".

Van Schaik's testimony was not shaken by cross-examination.

The next witness was Daly, master of the Cape South, the port hawser barge, a disinterested witness. He testified: "The tug rounded to about in the vicinity of 34th Street. I went to help a man on the tie-up boat, the Flannery. The captain of the Flannery was there. The tug rounded to in the usual way. The Flannery was ready to throw off his hawser. He was coming into this deck scow and came up hard against the corner of the scow around the bow port—maybe a little further back. The Flannery was being towed bow first. The contact was unusual—it was hard".

Neither observation of these witnesses, nor anything in their testimony, indicated to me anything but that each was telling the truth.

Against this testimony of eye witnesses, the respondent produced the captain of the tug and the two deckhands. Captain Salmon testified: "The Flannery never came closer than 50 feet to this scrap iron scow". Bennie, a deckhand testified: "The side of the Flannery was about 70 to 80 feet off the scow". Krutel, the other deckhand testified: "We passed her (the scow) about 60 or 70 feet".

Aside from the possible interest of the captain, and the usual loyalty of the crew, and the somewhat interesting agreement on space between the Flannery and the scow, the latter, by the way, very plainly being in all their minds as they sought to tie up the Flannery, certain facts not disputed and certain testimony of these same witnesses while not in itself alone sufficient, are nevertheless indications as to the probabilities that there was such a contact as Van Schaik and Daly said they saw and heard.

Captain Salmon testified: "It was flood tide. I had two deckhands. I proceeded up the East River, when about off 34th Street I started to round to, to find a place to tie up. It was then about 31st Street. After getting around I saw that there wasn't a safe place to tie up and I saw that the best place was at 29th Street. I proceeded to pull down that way and when we were abreast of this boat at 29th Street, I let the bow of the Flannery and the bow of the boat at 29th Street, which was a loaded coal boat, come together. I saw the scow loaded with scrap iron—it was about 31st Street. After I rounded to, I went back on the stern which has the same controls as those in the pilot house. My deckhands were down by the stern at the bitts watching the hawsers". On cross-examination he testified: "The tendency of the flood tide was to set the tow in towards the New York shore, but you make allowance for them. I left the pilot house and went to the stern as soon as I got completely around headed down the river". On re-direct he testified: "All I was interested in was to keep them clear of that scow. I saw the Flannery pass by the scow. The scow was the second boat off the wall outside of another boat. These two scows were about 30 feet wide each— maybe a little more".

The testimony of the deckhand Bennie indicates something also. He testified on cross-examination: "Q. What was there to attract your attention to the scow if she was 70 or 80 feet off? A. Well although the captain hadn't made a reference to it, I thought it was possible he may land the tow there, but he didn't. He pulled ahead to the coal boat tied up. I was wondering where he was going to land the tow".

It seems apparent therefore that at first Captain Salmon expected to land where the scow was, but later saw that, as he said, "it was not a safe place to tie up" so he selected a place alongside of a single coal barge a short distance ahead, but the scrap iron scow lay some distance out, even Salmon says, outside of other scows, and the Flannery would have to be pulled in somewhat to tie up to this coal barge ahead. This undoubtedly made Salmon anxious and the deckhand, Bennie, also thought they were going to tie up along the scow but the captain "pulled ahead to the coal boat".

Finally, the conceded fact is that after the collision with the scow, which contact was above the water line, the Flannery a few hours later was taken to Harlem, thereafter unloaded and taken to a dry dock in Brooklyn, where on April 11, a survey was held and signed, showing the damage on the starboard side from some blow. More than this Mr. Daly, the owner, testified: "I saw the boat the day following the accident April 9, I was called up to investigate the damage. It was heavy. The top log wasn't damaged at all. The first plank was below the log, the next was broken a little bit and then it came down at an angle about the third plank from the deck. The top log had an abrasion which indicated a contact but it wasn't broken".

Accordingly, I believe the testimony of libellant's witnesses. The fair inferences drawn from other testimony also points plainly to the truth of Van Schaik's and Daly's testimony as to where and how the collision took place.

There remains the argument of counsel for respondent that the damage from such a collision could not be as extensive as appeared on the survey and now claimed by libellant. They assert therefore that the whole story of libellant's witnesses is untrue and incredible. Nevertheless, this assertion rests on the speculation of Mr. Keating, shore captain of respondent, who a month or so after the survey and after talking with a lawyer, "came to the conclusion" that the damage must have come from some tug ramming its stem into the side of the Flannery. Yet there is not the slightest proof of any such thing having happened to the Flannery, which had been taken to Harlem by respondent's tug and on Monday, April 9, "the day following the accident" was found badly damaged on her starboard side by Mr. Daly, which occasioned taking her to dry dock.

In fact the point of the collision on the Flannery is far from being shown with such exactness as to precise space, etc.

Nothing is shown about the scow and her load.

That some damage could have been occasioned by the collision is evident even from the testimony of Mr. Keating, and at this stage of the action the question of its extent is not necessary to determine.

Accordingly, I find that the captain of the tug Bern carelessly allowed the barge Flannery to collide with the scow doing some damage and that libellant is entitled to the usual decree.

Submit findings of fact and conclusions of law.